Filed 1/5/16  In re L.B. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.B., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E063731 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ1200638) |
| v. | OPINION |
| M.S. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Timothy F. Freer, Judge.

Affirmed.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant mother.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant father.

1

Gregory P. Priamos, County Counsel, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

I

INTRODUCTION

Mother and father (parents) appeal a juvenile court order terminating their parental rights to their daughter, L.B. (born in 2010), under Welfare and Institutions Code section 366.26.[1] Juvenile dependency proceedings, lasting over two and a half years, were initiated due to concerns of parents neglecting L.B. Parents were living a transient lifestyle, failing to address their substance abuse issues, and engaging in domestic violence. Parents contend the juvenile court erred in rejecting the beneficial parent relationship exception to terminating their parental rights (§ 366.26, subd. (c)(1)(B)(i)). For the reasons stated below, we reject parents' contentions and affirm the judgment.

II

FACTS AND PROCEDURAL BACKGROUND

On August 9, 2012, the Riverside County Department of Public Social Services (DPSS) received a referral alleging general neglect of L.B. A DPSS social worker visited maternal grandmother's home where L.B. was living. Maternal grandmother expressed concern that L.B. was being affected by mother's lifestyle and unresolved substance abuse issues. Mother and father were homeless. Maternal grandmother had agreed to

---

[1] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

2

care for L.B. while parents stabilized. Mother permitted maternal grandmother to care for L.B. only in the evening. Mother spent most of the day at the pool with L.B.

Mother had a history of abusing methamphetamine, prescription drugs, and cannabis. Parents also had a history of domestic violence. On two occasions they engaged in domestic violence at paternal grandmother's house. During one incident, mother was under the influence of alcohol. There was a struggle between parents over L.B., during which L.B. fell out of her car seat, hitting her head, and sustaining scratches and a bruise on her head.

Maternal grandmother told the social worker on August 9, 2012, that she feared mother was not addressing her homeless situation and had unresolved substance abuse issues. Mother was not looking for work or a place to live. Mother reportedly had a history of lying and stealing from maternal grandmother. This was why L.B.'s maternal and paternal grandmothers would not allow parents to live with them.

After interviewing maternal grandmother, the social worker interviewed parents at the pool. L.B., who was at the pool with mother, was two years old and appeared healthy and bonded to parents. Mother denied neglecting her children. Mother said her eldest child, D.T., resided with his father,[2] and mother was providing for L.B. by allowing her to live with maternal grandmother at night because mother was homeless. Mother visited L.B. every day and took her to the pool. Mother denied any domestic violence but admitted arguing loudly with father in front of L.B. at paternal grandmother's home.

---

[2] D.T. is not involved in this appeal.

3

Mother also denied having a struggle over L.B. Mother said that L.B.'s bruises on her forehead were from bumping into walls and tables, and her other bruises and scraped knees appeared after father cared for L.B. and when her son caused L.B. to lose her balance. Mother denied any substance abuse but refused to drug test unless ordered by the court. Mother reportedly was enrolled in a substance abuse treatment program but was noncompliant. Father denied he neglected L.B., engaged in domestic violence, or struggled with mother over L.B. during an argument. He also denied L.B. was injured during the argument. Father denied having a history of drug abuse. He refused to test for drugs unless court ordered.

During a DPSS telephone interview of paternal grandmother on August 13, 2012, paternal grandmother stated she also was concerned about L.B.'s well-being in parents' care. Paternal grandmother allowed parents to camp in her backyard but did not allow them in her home because mother stole paternal grandmother's jewelry. Paternal grandmother said she called the police on August 3, 2012, because parents were abusing drugs and alcohol again. Paternal grandmother confronted mother about stealing paternal grandmother's jewelry. Mother started screaming while holding L.B. Father placed mother in a headlock and paternal grandmother removed L.B. from the area and called the police. Mother was asked to leave. The next day paternal grandmother reported that parents had struggled over L.B. Mother yelled and pulled L.B. out of the car seat. The car seat hit L.B. on the forehead. Paternal grandmother was concerned about L.B.'s exposure to parents' arguing and mother's drug use.

4

On August 28, 2012, paternal grandmother reported that father needed mental health services because he was bipolar. He needed counseling. He had completed anger management and had not benefitted. She said father had a history of drug abuse but stopped using drugs about eight years before, when his daughter was born. Paternal grandmother did not know if he was currently using drugs but thought he might be using marijuana, since mother had used it. Father was unemployed and had a criminal history, which included convictions for false impersonation (§ 529.3), receiving stolen property (§ 496), and false representation of identity to a peace officer (§ 148.9).

Parents' child welfare history included a referral in November 2010 for severe neglect, leading to mother testing positive for opiates and receiving a referral to counseling. In 2011, mother lived with maternal grandmother, from whom mother reportedly stole $15,000 while living with her. DPSS received another referral on June 12, 2012, of general neglect. Mother reportedly was abusing marijuana and methamphetamine.

**Juvenile Dependency Petition**

On August 27, 2012, DPSS held a team decision making (TDM) meeting. Parents failed to engage in any new services offered and mother continued to be noncompliant with her substance abuse program. Due to concerns of domestic violence, drug abuse, and parental instability, on August 29, 2012, DPSS filed an out-of-custody juvenile dependency petition under section 300, subdivision (b) (failure to protect). The petition alleged that although L.B. remained in parents' care, parents neglected her and engaged in domestic violence in L.B.'s presence, with one incident resulting in injury to L.B. In

5

addition, mother abused drugs and alcohol, endangering L.B.'s safety and well-being. Father knew or should have known of mother's drug abuse, minimized it, and failed to intervene on behalf of L.B. Mother also had unresolved mental health issues, placing L.B. at risk of harm and neglect. Father had a criminal history. Parents were unemployed, homeless, had a history of substance abuse, and were unable to provide L.B. with basic needs.

At the detention hearing, the court found L.B. came within section 300, subdivision (b), but did not order L.B. detained on the condition L.B. live with maternal grandmother or with mother while she participated in an inpatient program. The court ordered family maintenance services provided to parents.

**Jurisdiction Hearing**

DPSS reported in its jurisdiction/disposition report filed on September 18, 2012, that mother admitted she had been addicted to pain medication after two surgeries for kidney stones. She said she last abused prescription medication in November 2011. Mother acknowledged she was drinking excessively, enrolled in services, and was in an inpatient program. Mother denied any domestic violence. Mother was enrolled in a 45-day inpatient substance abuse program. L.B. was living with her. Mother acknowledged she was cited for driving under the influence (DUI) and shoplifting. Mother also said she had a mental health history. She had suffered from anxiety during pregnancy with L.B. and requested a mental health assessment for depression.

L.B.'s father had an extensive criminal history that included burglary, grand theft, possession of controlled substances, and assault with a deadly weapon. Father had served

6

a two-year prison term. Father was not taking seriously the issues that led to juvenile dependency proceedings. L.B. was healthy and meeting her milestones. DPSS recommended L.B. remain with parents.

In October 2012, DPSS filed an amended juvenile dependency petition adding allegations that father had a criminal history; he had unresolved mental health issues, including suicidal ideations; he was not receiving mental health care; father had a history of abusing controlled substances; and his whereabouts were unknown. The court ordered L.B. detained from father, with L.B. remaining in mother's custody and care. The court further ordered reunification services and supervised visitation twice a week for father. Father contacted DPSS on October 22, 2012, but failed to show for drug testing the following day.

On October 24, 2012, the juvenile court vacated the jurisdiction/disposition hearing and conducted a detention hearing on the amended juvenile dependency petition. That same day DPSS filed a second amended petition reflecting the changes to the petition the court found true. The court held a jurisdiction hearing on the original petition as amended. Mother reportedly had completed inpatient treatment, engaged in mental health services, took psychotic medication, continued her after care program, and attended narcotics anonymous and alcoholics anonymous meetings. Mother was permitted to retain custody of L.B. on family maintenance. The court ordered removal of L.B. from father. Reunification services were ordered for father and family maintenance services were ordered for mother.

7

**Six-Month Status Review Hearing**

DPSS reported in its six-month status review report filed in April 2013, that mother was living at a sober living facility with L.B. Father lived at a different sober living facility and was employed at an automotive business. Parents remained in a committed relationship and planned to reside together in the near future. Mother was arrested on April 3, 2013, for shoplifting and shoving the store manager who attempted to look in mother's purse to confirm the theft. Mother was released two days later, after pleading guilty to misdemeanor petty theft and misdemeanor battery. Mother reported experiencing symptoms of depression and anxiety, for which she was taking medication. Father did not consistently visit L.B. until after he was enrolled in an inpatient treatment program in December 2012.

DPSS reported in an addendum report filed on April 18, 2013, that mother and L.B. had moved in with maternal grandparents after mother's release. Parents were required to engage in individual counseling and address their mental health issues by completing a medication evaluation. At the six-month status review hearing on April 24, 2013, the court continued family maintenance for mother and reunification services for father. The court ordered a psychological evaluation for mother.

**Section 387 Supplemental Petition**

On April 30, 2013, DPSS filed a section 387 supplemental petition (supplemental petition) alleging that DPSS detained L.B. from mother on April 26, 2013, because mother violated her safety plan by using alcohol and had produced a diluted alcohol test result. Mother also continued to show mental health symptoms of severe depression,

8

which limited her ability to care for L.B.  DPSS reported in its section 387 detention report that on April 23, 2013, DPSS received a voicemail message that mother had admitted consuming alcohol.

On April 26, 2013, maternal grandmother expressed concerns mother was severely depressed and consumed with thoughts of drinking all the time.  Maternal grandmother suggested mother enroll in an intensive treatment program to address her substance abuse and mental health issues.  L.B. was detained in maternal grandparents' home and mother was required to move out.  Mother located housing at a sober living residence, with daily supervised visits with L.B.  At the detention hearing on the supplemental petition on May 1, 2013, the court ordered L.B. detained from mother.  The court authorized reunification services and supervised visitation twice a week.

**Jurisdictional/Dispositional Hearing on Supplemental Petition**

DPSS stated in its section 387 jurisdiction/disposition report that the previous disposition, in which L.B. remained in mother's care, had not been effective in protecting L.B.  Mother had failed to benefit from services.  She continued to abuse alcohol and her mental health issues remained unresolved.  Mother denied abusing alcohol.  She claimed she had a couple of "'slip-ups.'"  Maternal grandmother reported that mother is a "'good mother'" but maternal grandmother often needed to set boundaries, such as prohibiting mother from watching television or sleeping while visiting L.B.  DPSS noted that mother had a history of cyclical relapses and her mental health symptoms impaired her ability to cope and avoid substance abuse.  Father began abusing drugs and alcohol when he was 13 years old but claimed he had been sober since completing an inpatient treatment

9

program.  Father denied there had been any domestic violence between him and mother. Father said that he and mother still loved each other and were committed to being better parents and not abusing substances.

At the section 387 jurisdiction/disposition hearing in May 2013, the court found the petition allegations true and ordered L.B. removed from mother's care.  The court ordered services for parents and authorized visitation as previously ordered, including unsupervised, overnight/weekend visits for mother.

**Six-Month and 12-Month Status Review Hearings**

DPSS reported in its status review reports for hearings in October 2013 (father's 12-month review hearing) and November 2013 (mother's six-month review hearing) that mother's current living situation was unknown in October.  In November 2013, she was living with a friend and did not have stable housing.  She reported she was no longer living in a sober living facility, had ended her relationship with father, and was dating other men.  Mother was diagnosed with depression and prescribed medication.  Mother completed a psychological evaluation.  The doctor reported that mother experienced a high level of dysfunction and needed to address her depression and anxiety before she could adequately care for L.B.  Also, there would be a significant risk to L.B. until mother maintained sobriety for one year, engaged in therapy, and took psychotropic medication.

Mother's charges for shoplifting on April 3, 2013, were dismissed.  Parents continued frequently visiting L.B. at maternal grandparents' home.  Mother completed a parenting program in September 2013 and a substance abuse program in October 2013.

She was attending a drug and alcohol treatment aftercare program and had tested negative for controlled substances, with the exception of one test in May 2013, in which she tested positive for benzodiazepine.  As of November 2013, mother was employed.

Father was still at a sober living facility and working full time at an automotive business.  Father regularly attended sobriety meetings, complied with drug testing requests, and was making progress with complying with his case plan.  L.B., who was almost three years old, was living with maternal grandparents.  She was healthy, meeting her developmental milestones, attending preschool, and emotionally happy and stable.

At the October and November 2013 status review hearings, the court ordered L.B. to remain with maternal grandparents and authorized continued reunification services for parents and unsupervised, overnight/weekend visits.

**18-Month Status Review Hearing for Father**

DPSS reported in February 2014, that mother was living with maternal grandparents, with maternal grandmother acting as L.B.'s caregiver.  On February 27, 2014, father was arrested and was currently incarcerated for conspiracy to commit a felony (§ 182), second degree burglary (§ 459), misdemeanor possession of burglary tools (§ 466), misdemeanor impersonating a peace officer (§ 538d, subd. (a)), and felony vandalism (§ 594, subd. (a)).  Father denied any responsibility for burglary.  He said he was skating with a friend on someone else's property.  The property owner called the police and reported that father had tried to vandalize his property.  Father said he was in possession of tools because he was a mechanic.

11

Father had unsupervised visits with L.B. and appeared very bonded to L.B. According to father, parents were still in a relationship and were looking for a place to live together that was suitable for L.B. Father was close to completing his case plan. At father's 18-month review hearing in Aril 2014, the court authorized parents to live with maternal grandparents and L.B.

**12-Month Status Review Hearing for Mother**

DPSS reported in its 12-month status review report that parents were living with maternal grandparents and L.B. Mother was still employed at El Torito, continued to benefit from treatment, and no longer needed weekly therapy, although it was recommended twice a month. Mother's doctor, who monitored her medication, suspected mother was abusing controlled substances, because mother had borrowed medication from a friend and maternal grandmother. Father was unemployed because of his recent arrest. His therapy was terminated because father failed to attend his last two scheduled sessions. He began receiving counseling from another provider. At the 12-month status review hearing in May 2014, the court ordered L.B. returned to parents on family maintenance.

DPSS reported in November 2014, that parents had moved to a home in Perris and mother had quit her job. Mother was no longer seeing her mental health doctor who had been monitoring her medication for depression and anxiety. Instead, she reportedly was taking drug samples her father had given her through a friend who was a doctor. Mother had an active bench warrant for failure to appear on a misdemeanor shoplifting charge.

Maternal grandfather reportedly kicked father out because parents were abusing drugs and alcohol and were neglecting L.B.

Parents were not complying with their case plans. Parents were no longer participating in therapy or complying with required random drug testing. Father was not attending an aftercare substance abuse program. He also had not provided a hair follicle sample for testing. He shaved his entire body before the test. Mother's therapist reported that when mother had last attended a therapy session, she appeared to be high on drugs.

**Second Section 387 Supplemental Petition**

On December 9, 2014, DPSS filed a second section 387 supplemental petition. L.B., who was four years old, was removed from parents' home and detained in a foster home on December 5, 2014. Maternal grandparents and paternal grandparents indicated they were unable to care for L.B. Mother reportedly had failed to comply with her case plan and continued to abuse controlled substances, as demonstrated by a positive hair follicle drug test and by mother's own admission she was using methamphetamine. Mother suspected father was also abusing drugs. Father had failed to comply with his case plan and participate in court ordered services. At the detention hearing in December 2014, the court ordered L.B. detained from parents and placed in foster care. The court ordered reunification services for parents and authorized supervised visitation twice a week.

**Section 387 Petition Jurisdiction/Disposition Hearing**

DPSS reported in its section 387 jurisdiction/disposition hearing report that mother stated on December 22, 2014, that she had used methamphetamine the week before. Her

13

usage increased after L.B. was removed from her. Parents were homeless. Parents visited L.B. twice a week. At the end of her first visit in December 2014, L.B. reportedly became very upset and confused, and screamed and cried. L.B. no longer showed such distress when subsequent visits ended. During a visit on December 24, 2014, father did not interact much with L.B., and L.B. did not appear upset when her parents left. She appeared very happy when her foster parent came to get her.

DPSS concluded parents had not benefitted from 29 months of reunification services. Mother continued to abuse drugs and father had failed to comply with random drug and alcohol testing or attend an aftercare outpatient substance abuse program. Father was employed, laying tile. Father complied with an order on January 6, 2015, to provide a hair sample for testing. The test results were positive for amphetamine and methamphetamine at an extremely high level. Father did not comply with his case plan requirements for counseling or participating in an outpatient substance abuse aftercare program. Although father requested and received a referral to an inpatient substance abuse treatment program, he had not enrolled in the program. Father was told on January 21, 2015, that before visiting L.B., he must provide a saliva drug test sample on the days he was scheduled to visit L.B. twice a week. Thereafter, father did not call to set up a visit.

On December 30, 2014, mother admitted she had been using alcohol and methamphetamines, and also took Clonipin, received from a nonphysician for anxiety. Mother did not attend her outpatient program that day, was not going to counseling, and

14

did not attend her doctor appointment for monitoring her psychotropic medications for anxiety and depression.

On January 7, 2015, DPSS was notified mother was involved in a hit and run accident in which she was driving down the wrong side of the street and hit a parked car. Her car was found abandoned nearby. On January 16, 2015, mother entered an inpatient, 45-day treatment program. After beginning the program, she tested positive for drugs on January 18, 20, 21, and 23, 2015. DPSS reported mother had been in substance abuse treatment programs at least four times during the instant dependency proceedings, and was enrolled for a second time in an inpatient program.

DPSS reported in an addendum report filed in January 2015, that L.B.'s paternal first cousin once removed and spouse (prospective adoptive parents) were being assessed for placement. L.B. had begun visiting them.

On February 4, 2015, the court conducted a joint section 387 jurisdiction/disposition hearing and review hearing on the original amended petition. As recommended by DPSS, the court denied/terminated reunification services and set a section 366.26 hearing. Supervised visits were reduced to twice a month.

**Section 366.26 Hearing**

DPSS reported in May 2015, that L.B. had been placed with her prospective adoptive parents on February 10, 2015, and had bonded with them. L.B. was doing well in a preschool program. She appeared to be a happy, well-adjusted child. Although in February 2015, the court authorized parents to visit L.B. twice a month, during the subsequent four-month period, father visited L.B. only once, on March 3, 2015, and

15

mother visited twice. Two of parents' scheduled visits in March and April were cancelled because parents tested positive for methamphetamine the day of the visits. Father also cancelled another visit on April 28, 2015.

L.B. did well during her visits with parents. She was not emotional, even though mother was at times. L.B.'s prospective adoptive parents reported that after mother's April visit, L.B. said she missed her half-brother, D.T. (mother's older son). She seemed somewhat confused and did not want to talk about her visit with mother. After the visit, L.B. had some separation anxiety with her prospective adoptive parents. She became very upset and cried and did not want her prospective adoptive mother to leave when dropped off at preschool the day after the visit. This reportedly never had occurred before. L.B. was normally eager and happy to go to preschool.

Prospective adoptive parents were open to allowing L.B.'s grandparents, half-brother, and her extended family remain in contact with L.B. but requested time first to bond with L.B. After conducting a preliminary assessment of L.B.'s prospective adoptive parents, DPSS concluded L.B. was happy and comfortable in the home, which provided the stability and security L.B. needed. L.B. and her prospective adoptive parents had established a strong bond. L.B. looked to them for love and attention. DPSS recommended the court terminate parental rights and allow L.B.'s prospective adoptive parents to proceed with adoption.

During the section 366.26 hearing on June 2, 2015, mother testified that at the beginning of visits, L.B. would first run to mother and then run to father. She was happy to see parents. L.B. called mother "mom" or "mama," and father "dad" or "daddy." A

16

couple of times L.B. called mother "Kate," the name of her prospective adoptive mother. Mother believed L.B. was strongly bonded to her. Mother said she had been L.B.'s primary caretaker throughout L.B.'s life, until December 5, 2015, when L.B. was removed from mother's care. Visitation was reduced from twice a week to twice a month in January 2015.

Maternal grandmother testified L.B. loved mother. They had a great relationship and a strong parent-child bond. According to maternal grandmother, during visitation, mother took good care of L.B. and parents acted in a parental role. The DPSS social worker testified L.B. called her prospective adoptive parents mommy and daddy. L.B. no longer exhibited any negative behaviors at the end of visits or asked about parents between visits.

Mother argued at the section 366.26 hearing that the beneficial parent relationship and sibling relationship exceptions to terminating parental rights (§ 366.26, subd. (c)(1)(B)(i)) applied. Father joined in mother's contentions. The trial court denied both exceptions and terminated parental rights. The court found it was likely L.B. would be adopted and that adoption was in her best interests. The court further concluded it would not be in L.B.'s best interests for L.B. to continue her relationship with parents, noting: "[I]t would be a significant stretch for the Court to say that mother and father had consistent visitation."

17

III

BENEFICIAL PARENT RELATIONSHIP EXCEPTION

Parents contend the trial court abused its discretion by rejecting the beneficial parent relationship exception to adoption under section 366.26, subdivision (c)(1)(B)(i).

A. *Applicable Law*

At the section 366.26 hearing, the juvenile court's task is to select and implement a permanent plan for the dependent child. When there is no probability of reunification with a parent, adoption is the preferred permanent plan. (§ 366.26, subd. (b)(1); *In re Marina S.* (2005) 132 Cal.App.4th 158, 164.) If the juvenile court finds by clear and convincing evidence that a child is likely to be adopted, the juvenile court must terminate parental rights, unless one of several statutory exceptions applies. (§ 366.26, subd. (c)(1); *ibid.*)

Under section 366.26, subdivision (c)(1)(B)(i), the beneficial parent relationship exception may apply when a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); see *In re Derek W.* (1999) 73 Cal.App.4th 823, 826 ["parent has the burden to show that the statutory exception applies"].) The parent has the burden of showing either that "(1) continuation of the parent-child relationship will promote the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents [citation] or (2) termination of the parental relationship would be detrimental to the child." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466 (*Angel B*).)

18

No matter how loving and frequent the contact, and notwithstanding the existence of an "emotional bond" with the child, "the parents must show that they occupy 'a parental role' in the child's life." (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) The relationship that gives rise to this exception to the statutory preference for adoption "characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) To overcome the preference for adoption, the parent must show that severing the parent-child relationship "would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed. [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.]" (*Angel B., supra,* 97 Cal.App.4th at p. 466.)

Moreover, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; see *In re K.P.* (2012) 203 Cal.App.4th 614, 621 (*K.P.*).) The juvenile court may consider the relationship between a parent and a child in the context of a dependency setting, but the overriding concern is whether the benefit gained by continuing the relationship between the biological parent and the child outweighs the benefit conferred by adoption. (*In re*

19

*Lukas B.* (2000) 79 Cal.App.4th 1145, 1155-1156; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

*B. Standard of Review*

California courts have disagreed as to the applicable standard of review for an appellate challenge to a juvenile court ruling rejecting a claim that an adoption exception applies. We agree with the view expressed in *K.P., supra,* 203 Cal.App.4th at pages 621-622, "that the review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review." The substantial evidence standard of review applies to the factual determination of whether a beneficial parent or sibling relationship exists. (*Ibid*.) The abuse of discretion standard of review applies when determining whether the existence of that relationship constitutes a compelling reason for determining that termination would be detrimental to the child. (*Ibid.*)

*C. Discussion*

Parents have not demonstrated that their relationship with L.B. at the time of termination of their parental rights, after over two and a half years of juvenile dependency proceedings, was so significant that termination would greatly harm L.B. Nor have parents established that their relationship with L.B. outweighed the well-being L.B. would gain in a permanent, stable adoptive home. (*Angel B., supra,* 97 Cal.App.4th at p. 466.) Parents repeatedly failed to meet L.B.'s needs during their repeated abuse of controlled substances, treatment, and relapsing, over and over again. Parents long history of abusing drugs and relapsing, unfortunately, provides little hope of parents permanently overcoming their substance abuse. Overwhelming evidence demonstrates that, as a

20

consequence of parents' ongoing substance abuse, maintaining a parental relationship with L.B. would likely subject L.B. to the detrimental and harmful consequences of parents' emotional, mental, physical, and financial instability, along with harmful exposure of L.B. to parents' substance abuse, domestic violence, and unlawful conduct.

Although L.B. was initially strongly bonded to parents and parents held a parental role in L.B.'s life while residing with her, after L.B.'s detention in December 2014, that bond dissipated and parents' parental role ended. Parents were given the opportunity to visit L.B. after removal. Parents, however, failed to do so consistently and regularly because of their continued abuse of controlled substances.

Because parents demonstrated they were willing to do what was required to be good parents, the juvenile court and DPSS gave parents every benefit of the doubt and every opportunity to do so, over a relatively lengthy period of time. Nevertheless, parents failed time and again to rehabilitate. There came a point when the best interests of L.B. took precedence, because, "'. . . The reality is that childhood is brief; it does not wait while a parent rehabilitates himself or herself. The nurturing required must be given by someone, at the time the child needs it, not when the parent is ready to give it. [¶] The Legislature has expressed increasing concern with the perceived and accurate reality that time is of the essence in offering permanent planning for dependent children. . . .'" (*Jones T. v. Superior Court* (1989) 215 Cal.App.3d 240, 251, quoting *In re Debra M.* (1987) 189 Cal.App.3d 1032, 1038-1039.)

Here, the time came when it became clear that it was not in L.B.'s best interest to allow parents to continue to maintain a relationship with L.B. at the expense of depriving

21

L.B. of a stable, permanent, loving home. Parents demonstrated they were unable to maintain sobriety and there was a high probability they would show up for visitation under the influence of controlled substances.

"The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs. (*In re Jerome D.* [(2000) 84 Cal.App.4th 1200,] 1206.) While the exact nature of the kind of parent/child relationship which must exist to trigger the application of the statutory exception to terminating parental rights is not defined in the statute, the relationship must be such that the child would suffer detriment from its termination." (*Angel B., supra,* 97 Cal.App.4th at p. 467, fn. omitted.)

After L.B.'s removal from parents, primarily because of parents' substance abuse and inability to care for L.B., visits were supervised and became infrequent in 2015. Initially, in December 2014, visits were twice a week, but in January 2015, visits were reduced to twice a month, subject to parents testing negative for controlled substances before each visit. During the four-month period preceding termination of parental rights in June 2015, father visited L.B. only once and mother visited L.B. twice. Parents missed several scheduled visits because they tested positive for drugs. Parents failed to maintain regular and consistent visitation. Furthermore, without visitation, there could be no fulfilling a parental role. Despite parents' efforts to rehabilitate over two and a half years of receiving services, which included numerous referrals to inpatient and outpatient

22

substance abuse treatment programs, parents repeatedly relapsed and continued to abuse drugs.

At the time of the section 366.26 hearing, L.B. had been living happily with her prospective adoptive parents for four months. She had bonded with them and was doing well. During L.B.'s most recent visits with parents, she did not show a strong attachment to parents. The parties stipulated the social worker would testify that L.B. demonstrated no negative behaviors at the end of visits. She also did not ask her caretaker about parents between visits and called her prospective adoptive parents "mommy and daddy." Although, initially, after L.B. was removed from parents in December 2014, she cried and screamed at the end of her first visit, this behavior subsided as L.B. became accustomed to the visitation routine.

The totality of the evidence supports the trial court's finding that there would be no significant detriment in terminating parents' parental rights. At the time of the section 366.26 hearing, parents did not hold a parental role or have a substantial, positive emotional attachment such that L.B. would be greatly harmed by termination of their parental rights. (*Angel B., supra,* 97 Cal.App.4th at p. 466.) L.B. was adoptable and her prospective adoptive parents wished to adopt her.

Although parents attempted to overcome factors leading to the removal of L.B. and initially visited L.B. consistently, the trial court did not abuse its discretion in rejecting the beneficial parent relationship exception because during the six-month period preceding termination of parental rights, parents no longer consistently visited L.B., did not act in a parental role, and continued to abuse drugs, including on the day of scheduled

23

visits.  The trial court reasonably concluded that parents' relationship with L.B. did not outweigh the benefits of adoption by her prospective adoptive parents, with whom L.B. had bonded.

V

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

KING
Acting P. J.

MILLER
J.

24